FILED IN CHAMBERS
U.S.D.C. Rome

JUN 18 2007

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

MARCO ANTONIO LARA and LORENA LARA,

    Plaintiffs,

v.

TRI-STATE DRILLING, INC. and BRUCE THOMPSON,

    Defendants.

CIVIL ACTION

NO. 4:06-CV-0183-RLV

## O R D E R

This is a tort action arising from an accident that occurred at a work site and resulted in serious injury to the plaintiff Marco Antonio Lara. Pending before the court is a Motion to Intervene by S. Jahn Drilling & Blasting, Inc., and American Interstate Insurance Co. [Doc. No. 37], and a Motion to Compel by the plaintiffs [Doc. No. 51]. For the following reasons the Motion to Intervene is GRANTED, and the Motion to Compel is GRANTED.

**FACTUAL BACKGROUND**

On June 2, 2005, Marco Antonio Lara was injured while performing blasting operations at a Tri-State Drilling work site. Tri-State was drilling holes for power transmission lines, but due to the composition of the soil, it had contracted with S. Jahn Drilling & Blasting, Inc., to blast rock at certain locations so that Tri-State could set the foundations of the utility poles.

Part of the blasting procedure called for placing very heavy (approximately 4,000 pounds) blasting mats over the blast site. Once he had prepared the subject blast site, Lara required assistance to position a blast mat over it. Bruce Thompson had been operating a boom truck for Tri-State and was called to assist by lifting a mat with the boom on his truck.

After attempts at utilizing a D-ring to lift the mat had failed, Thompson used the "clam" feature of the boom. However, while Thompson used the clam to lift the mat, Lara walked under the suspended load and attempted to untangle blasting cords extending beneath it. At that point, the mat slipped from the clam and dropped onto Lara, causing serious injury. Subsequently, Tri-State issued a written warning notice to Thompson based on his actions while operating the boom truck.

**MOTION TO INTERVENE**

Lara sustained his injuries while employed by S. Jahn Drilling & Blasting, Inc. American Interstate Insurance Company covered S. Jahn Drilling's worker compensation benefits. Both S. Jahn Drilling and American Interstate move this court to intervene in this action while the plaintiffs object to intervention.

The movants assert that they are entitled to intervene in this action pursuant to Georgia's Worker Compensation Act, and that they

have a statutory grant of authority to intervene as a matter of right. In relevant part, the specific statute states:

> In the event an employee has a right of action against such other person . . . and the employer's liability under this chapter has been fully or partially paid, then the employer or such employer's insurer shall have a subrogation lien, not to exceed the actual amount of compensation paid pursuant to this chapter, against such recovery. The employer or insurer may intervene in any action to protect and enforce such lien. However, the employer's or insurer's recovery under this Code section shall be limited to the recovery of the amount of disability benefits, death benefits, and medical expenses paid under this chapter and shall only be recoverable if the injured employee has been fully and completely compensated.

O.C.G.A. § 34-9-11.1(b). The key statutory language giving rise to the plaintiffs' objection is the requirement that any recovery on the part of the employer and insurer can occur only *after* the employee has been "fully and completely compensated."

The plaintiffs argue, among other things, that the statute is contradictory because any right to intervene is conditioned on the plaintiffs having been fully and completely compensated, which has not occurred and is the very subject of this suit. Consequently, according to the plaintiffs, the statutory lien granted to S. Jahn Drilling and American Interstate is triggered only after the plaintiffs are fully compensated, not while their suit to recover such compensation is ongoing.

However, a subrogation lien can only be enforced if the employer or insurer intervenes in the employee's suit. Canal Ins. Co. v. Liberty Mutual Ins. Co., 256 Ga. App. 866, 869 (2002). Accordingly, it is clear that the movants have a right to intervene. Nevertheless, they are not necessarily entitled to recover on that lien until the plaintiffs have been fully and completely compensated. Further, the burden of proof is on the lien holder to show that the employee has been fully compensated before it may recover on that lien. See Canal Ins. Co, 256 Ga. App. at 873.

Although it may appear that the statutory language is contradictory, in fact the Georgia courts have interpreted the law in such a way as to create two distinguishable rights on the part of the employer and the employer's insurer. There is a right to intervene and there is a right to recovery. Both arise after different conditions are met. The right to intervene arises when an employer or its insurer may assert a subrogation lien pursuant to O.C.G.A. § 34-9-11.1(b). The right to recover, or enforce that lien, arises only after the employee has been fully and completely compensated. Georgia Elec. Membership Corp. v. Hi-Ranger, Inc., 275 Ga. 197, 198 (2002). Consequently, there are two distinct rights on the part of the employer and employer's insurer. The

4

first right, the right to intervene, is clearly established under Georgia law and affords the movants a right to intervene in this action. The second right, the right to recover, is not at issue here and therefore is not addressed. The issue of whether the intervenors may recover any compensation is properly addressed at trial upon a showing that the plaintiffs have fully and completely recovered. Consequently, the motion is GRANTED.

**MOTION TO COMPEL**

The plaintiffs move this court to compel production of the written warning notice that was issued to defendant Thompson. However, the defendants object to disclosing the warning notice and assert that it is an internal document protected from disclosure pursuant to the self-critical analysis privilege.[1]

The self-critical analysis privilege is an evidentiary privilege that was originally designed to protect from disclosure documents produced during peer review committee meetings in a medical malpractice action. <u>Bredice v. Doctors Hosp., Inc.</u>, 50 F.R.D. 249 (D.D.C. 1970). It has since evolved into a privilege protecting certain self-evaluations undertaken by organizations to

---

[1] Although the defendants' responses to the plaintiffs' discovery requests also asserted a privilege based on the work-product doctrine, they have since withdrawn that assertion.

determine their compliance with regulatory requirements without creating evidence that could possibly be harmful in future litigation. See Richhold Chemicals, Inc. v. Textron, Inc., 157 F.R.D. 522, 524 (N.D. Fla. 1994). Thus, the underlying policy reason supporting the self-critical analysis privilege reflects those of the medical peer-review privilege: to encourage an organization's compliance with laws that are aimed at protecting the health, safety, and welfare of all.

The history and application of the self-critical analysis privilege, however, are anything but clear. Not only has application of the privilege been rare, but many courts disagree over the extent to which the privilege should apply and whether any such privilege even exists. Compare Sheppard v. Consol. Edison Co., 893 F.Supp. 6, 8 (E.D.N.Y. 1995)(concluding that the self-critical analysis privilege is applicable to protect a company's internal study of equal employment opportunities); Banks v. Lockheed-Georgia Co., 53 F.R.D. 283 (N.D. Ga. 1971)(extending the self-critical analysis privilege from medical care to equal employment opportunity practices), with Arambu v. Boeing Co., 885 F.Supp. 1434, 1440 (D.Kan. 1995)(refusing to recognize the self-critical analysis as applicable to affirmative action plans); Tharp v. Sivyer Steel Corp., 149 F.R.D. 177, 185 (S.D. Iowa

6

1993)(refusing to recognize the privilege for documents created to comply with equal opportunity employment laws). The issue of whether there is a common law privilege against disclosure of peer review materials was addressed by the Supreme Court in University of Pennsylvania v. EEOC, 493 U.S. 182 (1990). In that case, the Court decided against creating a peer review privilege in the context of employment discrimination allegations. However, the Court limited its holding to Title VII cases and did not specifically address the self-critical analysis privilege. Id. at 582-85.

Although the viability of the self-critical analysis privilege is doubtful after University of Pennsylvania, some district courts in this circuit have subsequently recognized the privilege in contexts other than employment discrimination. See Joiner v. Hercules, Inc., 169 F.R.D. 695 (S.D. Ga. 1996)(recognizing the self-critical analysis privilege for documents evaluating a company's compliance with environmental regulations), and Shipes v. BIC Corp., 154 F.R.D. 301 (M.D. Ga. 1994)(recognizing the privilege for self-evaluative disclosures made to the Consumer Products Safety Commission). The defendants rely on these two post-University of Pennsylvania cases, as well as one pre-University of Pennsylvania case, Banks v. Lockheed-Georgia Co., 53 F.R.D. 283

7

(N.D. Ga. 1971), to assert that the self-critical analysis privilege is still viable and should be applied in this case to prevent disclosure of the written warning notice. However, any reliance on those cases is misplaced.

In Banks v. Lockheed-Georgia Co., the one pre-University of Pennsylvania case cited by the defendants for support, that court recognized the existence of the self-critical analysis privilege over documents prepared by the defendants to strengthen compliance with Title VII. The court reasoned that disclosing a company's internal investigations would discourage them from future attempts to equalize employment practices. Banks, 53 F.R.D. at 285. However, the validity of this opinion is seriously in doubt after the Supreme Court's decision in University of Pennsylvania. In that employment discrimination case, the Supreme Court declined to recognize a peer review privilege. While acknowledging the University's argument that a confidential peer review process may be useful for maintaining a properly functioning academic institution, the Court noted that Congress had considered the issue of confidentiality and determined that the interests of stamping out discrimination outweighed the interests of maintaining confidential peer review processes. University of Pennsylvania, 493 U.S. at 584. Thus, the validity of the court's decision in

Banks to encourage compliance with the law by recognizing the privilege runs counter to the Court's decision in University of Pennsylvania. Consequently, Banks provides very little support for the defendants' arguments that their internal report should be protected.

The defendants' reliance on the two post-University of Pennsylvania cases is likewise unhelpful. In Shipes v. BIC Corp., 154 F.R.D. 301 (M.D. Ga. 1994), the court recognized the self-critical analysis privilege and protected certain self-evaluative documents that the defendant had submitted to the Consumer Products Safety Commission. There, the court reasoned that the privilege is justified because "[t]he public interest is furthered when organizations or corporations analyze their safety records" and that such internal evaluations would cease if the contents were not confidential. Id. at 307. In Joiner v. Hercules, the court also recognized the self-critical analysis privilege, similarly reasoning that protection was necessary because the documents sought were prepared by the defendant to evaluate that company's compliance with environmental laws and that keeping such documents confidential was necessary for ensuring compliance with those laws. 169 F.R.D. 695, 698-99 (S.D. Ga. 1996). However, the fatal flaw in Shipes and Joiner, and in the defendants' argument, is the failure

9

to look to the proper body of law for determining whether the self-critical analysis privilege even exists.

This is a diversity action based on Georgia tort law. Accordingly, this court must look to Georgia law and not federal law when considering the issues in this case. Federal Rule of Evidence 501 governs the assertion of privileges and it requires that where "an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law." Thus, determining the issue of whether to recognize and apply the self-critical analysis privilege must be done in accordance with Georgia law, not federal common law.[2]

The court in <u>Shipes</u>, after noting that Georgia law applied to that diversity tort action, was similarly presented with questions concerning privileges, and it properly acknowledged that Rule 501 required deciding those issues according to Georgia law. Indeed, when it determined whether the attorney-client privilege protected

---

[2]Notably, the defendants entirely bypass this critical step of the analysis. The plaintiffs similarly miss the mark on applying Rule 501's mandate except for a single footnote stating their inability to find Georgia law adopting the self-critical analysis privilege.

10

certain communications, the court proceeded according to Georgia law. 154 F.R.D. at 304. However, when it came to determining the application of the self-critical analysis privilege, the analysis was not so precise.

The cause of action in Shipes was based on products liability. The plaintiff sought disclosure of certain communications made between the defendant and the Consumer Product Safety Commission. The defendant objected based on the self-critical analysis privilege. Examining the issue, the court first acknowledged that "privilege is defined by the law of the forum state" and then noted that "Georgia courts have not decided whether a common law privilege exists for self-critical analysis." However, the court nevertheless justified recognizing the self-critical analysis privilege by citing Georgia's statutory medical peer-review privilege and the similar reasoning behind it and the self-critical analysis privilege. Without any express adoption of the privilege in Georgia law, the court still recognized the privilege. Based on public policy grounds and "the analogous protection afforded under Georgia's Medical Peer Review Statute," the court concluded that "Georgia courts would endorse the self-critical analysis privilege." 154 F.R.D. at 306-07.

11

Likewise, the court in Joiner was presented with a state law cause of action. Although it noted the absence of the privilege under Georgia law and the fact that "the Georgia legislature has not yet clearly embraced it," 169 F.R.D at 698, the court nevertheless recognized the privilege based on public policy and the reasoning in Shipes and Banks, i.e., the medical peer-review privilege is sufficiently analogous to presume that the Georgia courts would recognize a self-critical analysis privilege. However, this court is not similarly inclined to make such a leap of state law interpretation absent a recognition of the self-critical analysis privilege by Georgia state courts or the state legislature.

It is true that Georgia has a statutory medical peer-review privilege. See O.G.C.A. § 31-7-143. It bars introducing into civil litigation any proceeding or recommendation of a medical review committee reviewing the matters that are a subject of the litigation. Emory Clinic v. Houston, 258 Ga. 434, 435 (1988). It is also true that the self-critical analysis privilege is based on the same rationale supporting the medical peer-review privilege. See Reichhold Chemicals, Inc. v. Textron, Inc., 157 F.R.D. 522, 525 (N.D. Fla. 1994)("The self-critical analysis privilege recognized in Bredice has been widely adopted in the medical peer review

12

context, and most of the 50 states have statutorily protected medical peer reviews of patient care from discovery."). Additionally, the peer review privilege in Georgia also applies to review organizations pursuant to O.G.C.A. § 31-7-133. However, the fact that the peer review privilege in this particular context is limited to review organizations within the healthcare field weighs heavily against extending such privilege to a corporate organization such as the defendant Tri-State Drilling, Inc. This is especially so in light of the legislative history of § 31-7-133 narrowing the definition of "review organization" to include only those working in the healthcare industry. Emory Clinic, 258 Ga. at 435 n.1. (noting that prior to being amended in 1984, the statute encompassed a broader definition of "review organization," including "'any committee engaging in peer review established by one of [sic] more State or local trade or professional societies or associations.'").[3]

The narrow approach taken by the Georgia legislature, and the complete absence of the Georgia courts having recognized a self-critical analysis privilege, leads this court to conclude that

---

[3] Even so, the Georgia medical peer review statute has always limited the evidentiary privilege to evaluations relating to the medical care and treatment of patients. See 1980 Ga. Laws 1283, 1284.

13

Georgia law does not allow for such a privilege. In a case such as this, where state law provides the rule of decision, a privilege exists only when created by state law. The fact that the legislature might create the privilege in the future, or that the state courts might recognize such a privilege, does not give this court the authority to apply the privilege in this case.

Consequently, without the availability of the privilege under Georgia law, there is no need to proceed with a determination of whether the self-critical analysis privilege would apply in this particular case. The defendants' written warning notice is not privileged. The motion is GRANTED.

**CONLCUSION**

For the foregoing reasons, the Motion to Intervene [Doc. No. 37] is GRANTED; the Motion to Compel [Doc. No. 51] is GRANTED.

SO ORDERED, this 18th day of June, 2007.

/s/ Robert L. Vining, Jr.
ROBERT L. VINING, JR.
Senior United States District Judge